UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BLUEHAVEN FUNDING, LLC and<br>KANICH DEVELOPMENT LLC., )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>FIRST AMERICAN TITLE INS. CO., )<br>ET. AL., )<br>)<br>Defendants. ) | Case No. 4:06CV1425SNLJ |

## MEMORANDUM

Plaintiffs have filed this twenty-two (22) count complaint asserting various claims for breach of contract, breach of fiduciary duty, and negligence in connection with certain monetary transactions involving the alleged purchase of real estate in St. Louis, Missouri. This matter is before the Court on defendant First American Title's motion for summary judgment (#17), filed March 27, 2008. Responsive pleadings have now all been filed and the matter is ripe for disposition.

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this

burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Citrate, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976).

Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." Hindman v. Transkrit Corp., 145 F.3d. 986, 990 (8th Cir. 1998)(citations omitted); *see*, Mayer v. Nextel West Corp., 318 F.3d. 803, 806 (8th Cir. 2003) *citing* Keathley v. Ameritech Corp., 187 F.3d. 915, 919 (8th Cir. 1999). However, it is clear that to survive summary judgment, a plaintiff must support his/her allegations with sufficient probative evidence to permit a finding in the plaintiff's favor based upon more than mere speculation, conjecture, or fantasy. Putnam v. Unity Health Systems, Inc., 348 F.3d. 732, 733-34 (8th Cir. 2003) *quoting* Wilson v. Int'l Bus. Mach. Corp., 62 F.3d. 237, 241 (8th Cir. 1995); Girten v. McRentals, Inc., 337 F.3d. 979, 982 (8th Cir. 2003)(plaintiff's theory of age discrimination failed "[b]ecause this theory is supported more by contentions and speculation than evidence, it is insufficient to withstand summary judgment.").

The parties dispute most of the facts in this case; however, based upon the Court's review of the pleadings and submitted exhibits, the Court determines the following to be the material an undisputed facts relevant to the issues raised in the instant summary judgment motion.

On or about July 9, 1999 defendant First American Title entered into a Policy Issuing Agency Contract (hereinafter referred to as "the Agreement") with the now-defunct Capital Title

2

Company.[1] First American Title was named as "principal" and Capital Title was named as "agent".[2] Defendant's Exhibit 2 - Agency Agreement.[3] Capital Title's appointment as an agent under the Agreement is set forth as follows:

> "**APPOINTMENT**
>
> 1. Principal hereby appoints Agent to act for, and in the name of, Principal in transacting title insurance business, but only for the purposes and in the manner specifically set forth in this contract and for no other purpose and in no other manner whatsoever. The authority hereby granted is subject to all of the limitations on the scope of the Agency contained in this contract, the limitations and regulations imposed by the insurance laws of the State of Missouri and rules promulgated pursuant thereto."

Defendant's Exhibit 1 - Affidavit of Nancy A. Eisenschiml; Defendant's Exhibit 2. The scope of authority granted to Capital Title pursuant to its appointment as First American Title's agent under the Agreement is set forth as follows:

> "**AUTHORITY**
>
> 2. Agent is authorized to issue, in the name of Principal, title insurance commitments and policies (including endorsements hereto); provided, that:
>
>> a. Each of them relates to land located in:
>>
>> **COUNTIES OF: ST LOUIS CITY AND COUNTY**
>>
>> b. Each of them is signed, personally, by such

---

[1] Capital Title Co. was placed into receivership in 2005. Two individuals, Robert Douglas Hartmann and Peter Shaw, were indicted for various criminal acts in connection with the downfall of Capital Title Co. In September 2005, Peter Shaw pled guilty to mail fraud and transportation of stolen money; he was sentenced to a term of confinement and restitution. In April 2009, Robert Hartmann pled guilty to two (2) counts of mail fraud; he is to be sentenced in June 2009. On or about January 25, 2007, defendant Capital Title Co. was dismissed without prejudice from this lawsuit.

[2] Evidently, there is another agency agreement with a non-party, Land Title Ins. Co., as the "principal" and Capital Title as the "agent". Plaintiffs did not name Land Title as a party-defendant in this lawsuit, asserting that they would seek leave to do so later. They reason that they can name another defendant at some unspecified period of time because a Rule 16 conference was never had in this case; therefore, a Case Management Order was never issued. Although that may be the case, plaintiffs have had plenty of time to add Land Title as a party-defendant and the lack of a CMO is no excuse for not having done so. To add Land Title at this late date, ostensibly awaiting ruling on the instant motion to be the catalyst, is not acceptable.

[3] In instances wherein the parties have filed duplicate exhibits, the Court will cite to only one exhibit for judicial efficiency. The Court's choice as to the exhibit cited in no way indicates any bias on the part of the Court.

> designated signatories of Agent, who have been authorized by Agent and approved in writing by Principal. The following signatories are presently approved by Principal:
>
> **PETER M. SHAW / PATRICK G. MCCARTHY**
>
> c. Each of them shall be issued in compliance with Principal's reinsurance rules amended from time to time by Principal upon written notice of the amendment to Agent. The following rule is included in the current reinsurance rules: `No title insurance commitments and policies may be issued on real estate transactions where the total liability of the Principal will equal or exceed $20,000,000.00 until the commitment or policy is submitted to the Principal for reinsurance.'
>
> d. None of them shall obligate Principal in a face amount in excess of $1,000,000.00 in the absence of specific written authority form **[sic]** Principal.
>
> e. Each of them is issued on a from **[sic]** furnished to Agent by Principal, the printed portion of which form has not been altered or changed by Agent except to the extent authorized in writing by Principal;
>
> **FIRST AMERICAN TITLE COMPANY**
>
> f. Each of them is based upon, and is in strict accordance with, a determination of insurability made in the manner specified in paragraph 4 of this contract.
>
> g. Each of them is issued with professional care and skill and in strict compliance with such rules, regulations and instructions as Principal may issue to Agent in respect to safe and acceptable underwriting practices."

Defendant's Exhibit 2. The Agreement provides further limitations on the scope of Capital Title's authority as First American Title's agent as follows:

> **"LIMITATIONS ON AUTHORITY**
>
> 3. This contract gives Agent no authority to incur obligations on behalf of Principal, except as herein specifically provided, no authority to commit Principal to any interpretation of the printed terms of any document, no authority to execute any agreement on behalf of Principal. Except as authorized in writing by Principal, and no authority to accept service of summons or other process on behalf of Principal. Agent shall notify Principal immediately of any attempted service of process and shall inform Principal of all the surrounding circumstances which are known by Agent."

Defendant's Exhibit 2.

Pursuant to the Agreement, Capital Title was authorized only to act as agent for First American for the limited purpose of issuing title insurance commitments and policies related to land located in St. Louis City and St. Louis County. Defendant's Exhibit 1; Defendant's Exhibit 2.

On or about January 10, 2005 defendant filed a "Verified Petition for Breach of Agency Agreement and Application for Appointment of Receiver". Plaintiffs Exhibit 5. In the petition, defendant asserts that "[P]ursuant to the terms of the Agency Contract, Plaintiff First American Title Ins. Co., as principal, designated Capital Title Company to issue title insurance commitments and policies in the name of First American Title Ins. Co., and, in general, to act as its agent in transacting title insurance business." Plaintiffs' Exhibit 5, ¶9. The petition further asserts that "[D]efendant Capital Title Company is obligated pursuant to the terms of the Agency Agreement and Agency Contract to implement and to abide by the accounting procedures required by the Plaintiffs in connection with the collection and disbursement of funds entrusted to Capital Title Company pertaining to real estate transactions involving the issuance of title policies in the name of First American Title Ins. Co. or LTIC of St. Louis." Plaintiffs' Exhibit 5, ¶13. The petition further asserts that First American had legal and equitable liens on all property of Capital Title for all sums due it. Plaintiffs' Exhibit 5, ¶17. The petition further asserts that as of a January 14, 2005 audit, Capital Title had failed to "report more than 1,600 policies issued in the name of LTIC of St. Louis, and has failed to remit more than $600,000 of premiums to LTIC of St. Louis over the last 18 months." Plaintiffs' Exhibit 5, ¶21. The petition further asserts that Capital Title had violated the Agency Contract "in that funds in excess of ten thousand dollars have been withdrawn from the Escrow Account and/or have not been deposited therein for the benefit of the intended payee or payees in real estate transactions involving the issuance of title policies in the names of First American Title Ins. Co. and LTIC of St. Louis." Plaintiffs' Exhibit 5, ¶22. The petition further asserts that "[A]s of January 14, 2005, the audit findings are that the aggregate amount of outstanding checks drawn on the Escrow Account exceeds the balance on deposit in said account by approximately $6,500,000.00". Plaintiffs' Exhibit 5, ¶23. Finally, the Petition, upon specifying the ways upon which Capital Title has and continued to cause harm, asserts that

First American "[I]n order to protect First American Title Ins. Co. and LTIC of St. Louis, their insureds, proposed insureds and the customers of Capital Title Company, it is necessary to immediately appoint a Receiver to take charge of all of the property and accounts in which Capital Title Company possesses any legal or equitable interest that are subject to the rights of First American Title Ins. Co. and LTIC of St. Louis under the Agency Agreement or Agency Contract." Plaintiffs' Exhibit 5, ¶28.

On or about January 18, 2005 Capital Title Co. ceased doing business in Missouri when all of its assets were seized and liquidated by a trustee for the benefit of creditors in the receivership proceeding of **First American Title Ins. Co., et. al. v. Capital Title Company, Inc., et. al.,** St. Louis County Circuit Court Case No. 05CC-247. Following the discharge of the appointed trustee, business records and files of Capital Title Company in possession of the former receiver were turned over to First American Title which agreed to maintain and hold title files in storage for fifteen (15) years from closing in accordance with Chapter 381 of the Revised Missouri Statutes. Defendant's Exhibit 1, Defendant's Exhibits 3 and 4 - plaintiffs' discovery responses.

On or about April 7, 2005 the Circuit Court for St. Louis County entered an Order in Receivership Proceeding of Capital Title Company that established a claims bar date with respect to all claims against the assets of Capital Title, and further provided for publication of legal notice that "ALL CLAIMS NOT FILED ON OR BEFORE JUNE 1, 2005 SHALL BE BARRED." Defendants' Exhibit 5. Neither plaintiff Bluehaven nor plaintiff Kanich ever filed or otherwise asserted a claim against Capital Title Co. in the Receivership Proceeding. Defendant's Exhibits 3 and 4.

Beginning in 2002, prior to Capital Title being placed in receivership and liquidated, plaintiffs loaned approximately $2.4 million dollars to Douglas Hartmann, d/b/a DHP Investments, for the purchase of certain properties in St. Louis City and St. Louis County. These funds were placed in a construction loan escrow account, but thereafter, Hartmann misappropriated the funds to his own use. At that time, Hartmann, doing business as DHP Investments, maintained an office at Capital Title, and utilized its office equipment. The basis of plaintiffs' claim against defendant, here, is that their losses were incurred because the loan proceeds were funneled through Capital

6

Title's escrow and closing services and that Capital Title, as the agent of defendant, mishandled the real estate closings and escrow accounts allowing Hartmann to divert the funds to his own use.

However, plaintiffs never asked Capital Title for a title insurance commitment or policy to be issued by First American to insure their interest in any loan or real property purchase identified in the instant complaint. Defendant's Exhibits 1, 3, and 4. Neither Capital Title nor First American ever issued a title insurance commitment or policy in the name of First American to either of the plaintiffs, as the insured, to insure any loan, real property, or transaction involving the plaintiffs as alleged in the instant complaint. Plaintiffs did not initiate any communication to First American, or receive any communication from First American, regarding Capital Title or any of the loan transactions involving the properties as alleged in the instant complaint. There is not a single title insurance commitment or policy issued in the name of First American for Bluehaven or Kanich, as the insured, in connection with any loan or real property interest of the plaintiffs in any of the real property identified in the instant complaint. Defendant's Exhibit 1.

There was never any communication, during the relevant time-period, between the plaintiffs and defendant, that Capital Title, as an agent for First American, would record deeds of trust on the plaintiffs' behalf with respect to their interest in any loan or real property identified in the instant complaint. Defendant's Exhibits 1, 3, and 4. The plaintiffs and defendant never entered into any agreement, oral or written, that First American would record any deed of trust to secure any lien or mortgage held by the plaintiffs on any real property identified in the instant complaint. Defendant's Exhibits 1, 3, and 4. First American did not communicate to either of the plaintiffs that Capital Title, as agent for First American, would ensure that either plaintiff would recover the full value of their liens when their real properties sold based upon any deed of trust plaintiffs believed they had on the real properties identified in the instant complaint. Defendant's Exhibits 1, 3, and 4. First American did not communicate to either of the plaintiffs that Capital Title, as an agent for First American, would authenticate or verify signatures on deeds of release presented at the closing(s) to protect their interest in any real property identified in the instant complaint. Defendant's Exhibits 1, 3, and 4. First American did not enter into any contractual

7

relationship, oral or written, with the plaintiffs to ensure that they would receive full pay-offs on any deed of trust to any real property identified in the instant complaint. Defendant's Exhibits 1, 3, and 4. First American did not enter into any contractual relationship, oral or written, with the plaintiffs to accept and verify the authenticity of any deed of trust in relation to any real property identified in the instant complaint. Defendant's Exhibits 1, 3, and 4. First American did not receive notice of the sale or closing, from the plaintiffs, with respect to any closing for any loan, or real property transaction identified in the instant complaint. Defendant's Exhibits 1, 3, and 4. First American did not enter into any agreement, oral or written, with the plaintiffs that First American or Capital Title, as agent for First American, would verify that all pre-existing deeds of trust on any particular real property, as identified in the instant complaint, were paid and satisfied when any real property was purchased by the plaintiffs. Defendant's Exhibit 1. First American did not communicate to the plaintiffs that Capital Title, as an agent for First American, would verify that all pre-existing deeds of trust would be paid and satisfied when any real property, identified in the instant complaint, was purchased by the plaintiffs. Defendant's Exhibit 1. First American did not enter into any agreement with the plaintiffs, oral or written, under which First American agreed that it would care for, hold, maintain or account for escrow funds collected from or on behalf of the plaintiffs concerning any loan or real property transaction as alleged in the instant complaint. Defendant's Exhibits 1, 3, and 4. First American did not communicate to plaintiffs that Capital Title, as agent for First American, would care for, hold, maintain, or account for escrow funds collected from or on behalf of the plaintiffs concerning and loan or real property transaction as alleged in the instant complaint. Defendant's Exhibits 1, 3, and 4. First American did not enter into any agreement with the plaintiffs, oral or written, under which First American agreed to disburse escrow funds collected from or on behalf of the plaintiffs with respect to any loan or real property transaction as alleged in the instant complaint. Defendant's Exhibits 1, 3, and 4. First American did not communicate to plaintiffs, orally or in writing, that Capital Title, as an agent for First American, would disburse funds collected by either Capital Title or Robert Douglas Hartmann from or on behalf of the plaintiffs with respect to any loan or real property transaction as alleged in the instant complaint. Defendant's Exhibits 1, 3, and 4.

First American is not a party to the Construction Loan Escrow Agreement attached the plaintiffs' complaint as Exhibit A.  Defendant's Exhibits 1, 3, and 4.  First American did not receive any direct benefit or funds from the plaintiffs, Robert Douglas Hartmann, DHP Investments, or Capital Title in connection with any loan or real property interest identified in the instant complaint.

First American provided Capital Title with brochures and various "trinkets" (e.g. pens and markers) with both Capital Title's and First American's logo on them.  Plaintiffs' Exhibit 3 - Deposition of Robert G. Meckfessel, pg. 23.  First American also retained the right to inspect and audit Capital Title's escrow accounts and escrow files pursuant to the Agreement as follows:]

> **"RECORDS RETENTION**
>
> 8. Agent shall maintain in a manner and form as prescribed or approved by the Principal, all supporting documents which enable Agent to issue a commitment or policy, together with all books, books of account, files, documents, correspondence and records of all kinds which at any time shall be kept by Agent or come into Agent's possession or under Agent's control, relating to transactions conducted by Agent on behalf of the Principal.  Agent shall maintain all such information in original form, or on microfilm or other legible reproduction for a period of at least twenty (20) years.  All such documents shall be available at all times for inspection and audit by accredited representatives of Principal.
>
> 9. Agent shall allow Principal to periodically inspect and audit Agent's escrow accounts and escrow files in those instances where Principal's commitments and policies are issued pursuant to said escrows.  The frequency and extent of such inspections and audits shall be determined by Principal but shall be at reasonable times with at least 5 days advance notice to Agent.
>
> The right of the Principal to periodically inspect and audit Agent's escrow accounts and escrow files shall not be construed by the Agent or any party dealing with Agent as an undertaking on the part of Principal to assume any responsibility or liability for the acts of or any errors or omissions of the Agent in the performance of Agent's duties as escrowee under any escrow agreement.
>
> In the event a shortage is revealed or discovered in Agent's accounts of funds entrusted to Agent by others or in the remittance due Principal hereunder, Principal may immediately declare due and payable any amounts owed to Principal by Agent, including any funds for which Principal may be responsible or have liability therefor.  Agent shall immediately bring the shortage in balance.
>
> In the event Principal determines, in its sole discretion, that Agent may not be operating in accordance with the provisions of this Agency

> Contract, Principal shall have the right of immediate access and inspection to the escrow files and or title files of Agent for audit purposes."

Defendant's Exhibit 2.

Plaintiffs contend that due to an agency relationship between the defendant and Capital Title, First American is vicariously liable and the losses they suffered are recoverable from First American. First American contends that its agency relationship with Capital Title was limited to issuing title insurance commitments and/or policies. It contends that Capital Title did not have actual or apparent authority to close the plaintiffs' loans to Hartmann d/b/a DHP Investments for property with an uninsured title, or to record deeds of trust on property for which no title policy was issued, or to ensure that validity of signatures on uninsured loan documents and loan collateral security agreements, or to verify the release and satisfaction of pre-existing deeds of trust to collateral upon the sale of property with uninsured title, or to escrow and properly disburse loan proceeds to repay plaintiffs' loans to Hartman. Finally, defendant contends that it is not liable to plaintiffs pursuant to any negligence claim since it did not owe a duty to plaintiffs regarding any loan or real property transaction outside the parameters of the Agency Agreement with Capital Title.

Under Missouri law, there are three (3) requisites to establishing an agency relationship: 1) the agent holds the power to alter legal relations between the principal and third parties; 2) the agent is a fiduciary with respect to matters within the scope of the agency; and 3) the principal has the right to control the conduct of the agent with respect to matters entrusted to the agent. State ex. rel. Ford Motor Co. v. Bacon, 63 S.W.3d. 641, 642 (Mo. 2002); Hardcore Concrete L.L.C. v. Fortner Ins. Services, Inc., 220 S.W.3d. 350, 354-55 (Mo.App. 2007); Parshall v. Buetzer, 195 S.W.3d. 515, 519 (Mo.App. 2006). "A principal is responsible for its agents' acts and agreements that are within the agent's authority, whether the authority is actual or apparent." Motorsport Marketing, Inc. v. Wiedmaier, Inc., 195 S.W.3d. 492, 498 (Mo.App. 2006) *quoting* Sherman, Taff & Bangert, P.C. v. Clark Equip. Co., 133 S.W.3d. 125, 127 (Mo.App. 2004). A party who relies upon the authority of an agent has the burden of proof regarding both the fact of the agency relationship and the scope of the agent's authority. Romak USA, Inc. v. Rich, et. al.,

384 F.3d. 979, 985 (8th Cir. 2004) *citing* Karr-Bick Kitchens & Baths v. Gemini Coatings, Inc., 932 S.W.2d. 877, 879 (Mo.App. 1994). Express authority and apparent authority arise from the acts of the principal, not the alleged agent. Romak USA, at 985 *citing* United Missouri Bank v. Beard, 877 S.W.2d. 237, 240-41 (Mo.App. 1994).

A principal may be responsible for the acts and agreements of its agent if the agent acts with actual authority, either through express terms or manifestations of consent or through implied terms or manifestations of consent. *See*, Hardcore Concrete, at 355; Parshall, at 519; Lynch v. Helm Plumbing and Electrical Contractors, 108 S.W.3d 657, 660 (Mo.App. 2002). "'Express authority is created what the principal explicitly tells the agent what to `do'" and "'implied authority consists of those powers incidental and necessary to carry out the express authority.'" Hardcore Concrete, at 355 *quoting* Nichols v. Prudential Ins. Co.of America, 851 S.W.2d. 657, 661 (Mo.App. 1993); *see also*, IOS Capital, L.L.C. v. Allied Home Mortgage Capital Corp., 150 S.W.3d. 148, 151-52 (Mo.App. 2004).

It is clear from the Agency Agreement that Capital Title via Robert Douglas Hartmann, d/b/a DHP Investments did not have express authority to do anything other than issue title insurance commitments and/or policies for land located in St. Louis City and St. Louis County on First American's behalf. There is absolutely no evidence before the Court from which any reasonable juror could conclude that First American manifested its consent to Capital Title to engage in any of the acts alleged in the complaint. Therefore, Capital Title did not have express actual authority to act as First American's agent with respect to any of the alleged acts identified in the complaint in connection with any loan or real property transactions involving the plaintiffs and Hartmann.

"Implied authority is actual authority which the principal intended the agent to possess that lacks direct proof, but rather is implied from relevant facts and circumstances as reasonably necessary to accomplish the purpose or purposes of the expressly conferred authority." IOS Capital L.L.C., at 151-52 *citing* Mark Century Corp. v. Tiger Broadcasting Co., 509 S.W.2d. 737, 739 (Mo.App. 1974). "Implied authority concerns only the extent of an express authority

11

actually granted. If the agent does not have actual authority, then no authority can be implied." IOS Capital, L.L.C., at 152 (internal citation omitted).

As previously stated, it is clear from the Agency Agreement that Capital Title did not have the express authority to engage in the acts alleged in the complaint. Because Capital Title did not have express authority to engage in the acts alleged in the complaint, no authority to engage in the acts alleged in the complaint can be implied. Thus, Capital Title did not have implied actual authority to engage in the acts alleged in the complaint on behalf of First American.

In the absence of actual authority, an agent's acts may be binding upon the principal if performed with apparent authority.

> "Apparent authority is created by the conduct of the principal which causes a third person reasonably to believe that another has the authority to act for the principal. A finding of apparent authority requires evidence that a principal has communicated directly with the third party or has knowingly permitted its agent to exercise authority. Thus, actual authority is created by the principal's manifestations to the agent, whereas apparent authority is created by the principal's manifestations to a third party."

Hardcore Concrete, at 355 n.4 *citing* Nichols, at 661-62; *see also*, IOS Capital L.L.C., at 152. To establish the apparent authority of an agent, Bluehaven and Kanich must show that: 1) the principal manifested its consent to the exercise of such authority or knowingly permitted the agent to assume the exercise of such authority; 2) the person relying on this exercise of authority knew of the facts and, acting in good faith, had reason to believe, and actually believed, the agent possessed such authority; and 3) the person relying on the appearance of authority changed his position and will be injured or suffer loss if the transaction executed by the agent does not bind the principal. Motorsport Marketing, at 498; IOS Capital, L.L.C., at 152; Lynch, at 660. "'Apparent authority results from a direct communication from the principal to a third party causing that third party to reasonably believe that a person has authority to act for the principal.'" Motorsport Marketing, at 498 *quoting* Alexander v. Chandler, 179 S.W.3d. 385, 388 (Mo.App. 2005). Finally, any reliance by the third party must be reasonable. Lynch, at 660 (internal citation omitted). Thus, "[t]he determinant of apparent authority is what a principal causes a third party

to believe about the agent's authority." Lynch, at 661 *citing* Euclid Plaza Associates, L.L.C. v. African American Law Firm, L.L.C., 55 S.W.3d. 446, 450 (Mo.App. 2001).

In the instant matter, there were no direct communications between First American and the plaintiffs in connection with any of the loan or real property transactions as alleged in the complaint. Plaintiffs, instead, attempt to create apparent authority by arguing that a training manual, certain advertising (i.e. promotional trinkets), and a website maintained by First American empowered Capital Title to act as First American's agent in connection with the alleged acts identified in the complaint. The flaw in this argument is that there is absolutely no evidence on the record that either of the plaintiffs ever became aware of, were induced by, or relied upon these extraneous matters in deciding to loan copious amounts of money to Hartman, who in turn, allegedly promised to buy certain properties that would be secured by deeds of trust. The fact that First American's management personnel testified that part of its business is the provision of escrow and closing services is irrelevant to this lawsuit because 1) the Agency Agreement expressly limited Capital Title's services (on behalf of First American) to the issuance of title insurance commitments and/or policies; and 2) the record is devoid of any knowledge or awareness by these plaintiffs that First American also provided other services, including escrow and closing services. Plaintiffs' Exhibit 4 - Deposition of Albert Rush. However, whether or not First American has other agents who provide these services is immaterial; no reasonable juror could find that in this case, First American ever communicated or manifested in some manner to the plaintiffs that Capital Title was its agent to provide escrow and closing services, and that the plaintiffs relied on these communications and/or manifestations to conduct business with Hartmann. Furthermore, outside of notarizing Hartmann's signature, neither of the plaintiffs nor their representatives ever gave instructions to employees of Capital Title with respect to the sale and transfer of real estate. Plaintiffs' Exhibit 8- Deposition of Michele M. D'Angelo, pgs. 114-16. Plaintiffs never gave instructions to employees of Capital Title with respect to disbursing their loans to Hartmann, nor did they ever request a closing protection letter or lender's policy of title

insurance with respect to the loans alleged in the complaint.[4] Plaintiffs' Exhibit 8 - D'Angelo Deposition, pgs. 114-16; 122; and 139. Plaintiffs never asserted any reasonable reliance by their own actions on any purported apparent authority of Capital Title to provide escrow and closing services on behalf of First American.

There is no material issue of fact in dispute that the agency relationship between First American and Capital Title was strictly limited to the issuance of title insurance commitments and/or title insurance policies; and no reasonable juror could find that express actual authority, implied actual authority, or apparent authority existed for Capital Title to handle loan proceeds or record deeds of trust, or engage in any of the other alleged acts in the complaint, outside of insured closings for real estate transactions. Ultimately, the transactions that are the subject of plaintiffs' complaint cannot be said to be within the scope of authority granted by defendant to Capital Title, whether actual or apparent, because none of the transactions involved the procurement or issuance of title insurance from defendant. Although Capital Title was indeed the agent for defendant, the transactions here were "on the side." Thus, First American is not vicariously liable for the acts and, ultimately for plaintiffs' losses, as alleged in Counts I-XXI of the complaint.

In Count XXII of the complaint, plaintiffs assert a claim of direct negligence for defendant's alleged failure to monitor and/or audit Capital Title. Plaintiffs contend that First American owed them a duty to inspect the records of Capital Title pertaining to escrow accounts, underwriting practices, policy accountability, and premiums; and if it had done so, First American would have discovered the "criminal activities" of Hartmann and Shaw (presumably preventing the activities and losses alleged in the complaint).

In any action for negligence, the plaintiff must establish that the defendant had a duty to the plaintiff, that the defendant failed to perform that duty, and that defendant's breach was the proximate cause of plaintiff's injury. <u>Zubres Radiology v. Providers Ins. Consultants</u>, 276

---

[4] One title insurance policy was issued for 4005 Delmar where plaintiff Bluehaven is the insured but no claim is asserted under that policy; other title insurance commitments and/or policies issued by First American name "Bruce Hartrich" as the insured, and he is not a party-plaintiff to this action. Plaintiffs' Statement of Facts, ¶147; Plaintiffs' Exhibit 38.

S.W.3d. 335, 340 (Mo.App. 2009); Midwest Bankcentre v. Old Republic Title Co. of St. Louis, 247 S.W.3d. 116, 122-23 (Mo.App. 2008); State Resources Corp. v. Lawyers Title Ins. Corp., 224 S.W.3d. 39, 48 (Mo.App. 2007) *quoting* Hecker v. Missouri Prop. Ins. Placement Facility, 891 S.W.2d. 813, 816 (Mo. 1995). Whether a legal duty exists is a question of law. Zubres, at 340-41; Midwest Bankcentre, at 123; State Resources Corp., at 48. "Essential to the finding of a duty is `the existence of a relationship between the plaintiff and defendant that the law recognizes as the basis of a duty of care.'" Zubres, at 341 *quoting* Manzella v. Gilbert-Magill Co., 965 S.W.2d. 221, 225 (Mo.App. 1998). A legal duty owed by a defendant to a plaintiff may arise under one of three sources: 1) the legislature; 2) the law; or 3) a contract/agreement. Midwest Bankcentre, at 123 (internal citations omitted).

Plaintiffs argue that First American had a duty to third parties to audit, inspect, or curtail the loan processing or recording activities of its agents; more specifically, Capital Title via Hartmann and Shaw. They contend that their losses were "foreseeable" because proper audits would have uncovered the criminal activities of Hartmann and Shaw; and further, that the audits that were done clearly indicated that Capital Title was engaging in substandard escrow and closing practices. Finally, plaintiffs contend that Missouri law imposes a duty on First American to supervise its agents' escrow and closing practices.

"In determining whether a duty exists under a particular set of circumstances, [a] Court must weigh the foreseeability of the injury, the likelihood of the injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant." Midwest Bankcentre, at 126 *citing* Hoffman v. Union Electric Co., 176 S.W.3d. 706, 708 (Mo. 2005). "Foreseeability" is defined as "the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it." Midwest Bankcentre, at 126 *quoting* Lopez v. Three Rivers Electric Cooperative, Inc., 26 S.W.3d. 151, 156 (Mo. 2006). "The test for determining foreseeability is whether there exists `some probability of sufficient moment' that an injury would occur, which would induce a reasonable mind to take precautions to avoid it." Midwest Bankcentre, at 126 *quoting* Lopez, at 156.

15

Plaintiffs argue that First American acknowledges the foreseeability of risk arising from escrow and closing services via its website and the deposition testimonies of Albert Rush, First American's Senior Vice-President and Daniel Gomsrud, First American's Regional Audit Manager. They further contend that this duty was breached because First American did not follow-up on the findings of Robert Meckfessel, First American's Regional Vice-President regarding the audits of 2000 and 2003.

The Court has carefully reviewed the proffered deposition testimonies, and the deponents clearly were testifying as to audits done pursuant to the Agency Agreement between First American and Capital Title; thus, the audits were done in regard to any transactions where there was a policy of title insurance issued. *See*, Plaintiffs' Exhibit 3, pgs. 106-07. There is no dispute that the subject Agency Agreement provided for periodic audits by First American as to its agents handling of monies wherein the agent was issuing title insurance commitments and/or policies in the name of First American. Moreover, when the issue of the escrow accounts not being properly reconciled became more significant, First American took legal action.

Furthermore, plaintiffs never communicated to First American or entered into any agreements with First American with regard to the alleged recording or escrow holding services in connection with their loans to Hartmann. Capital Title was not expressly or apparently authorized to act as First American's closing agent with respect to the plaintiffs' loans to Hartmann, and the website's description of the duties and obligations of closing agents in general fails to provide any "foreseeability" that the unauthorized escrow holding and recording activities of Capital Title via Hartmann involving uninsured loan/real estate transaction would injure the plaintiffs. There is nothing in the record which establishes a common-law duty by First American to protect the plaintiffs from activities by Capital Title outside of the Agency Agreement.[5]

Next, plaintiffs argue that Missouri insurance laws create some general duty to third parties in real estate transactions; however, Count XXII is very specific as to the duty plaintiffs

---

[5]The Court has carefully reviewed the plaintiffs' cited caselaw for imposing a general common law duty upon the defendant. The cases are inapplicable in that they either do not address a negligence claim against a title insurer or the title insurance agent failed to provide its contracted services properly.

16

alleged that the defendant breached; i.e., that First American, as a title insurer, had a duty to third parties to audit, inspect, or curtail the loan processing or recording activities in connection with uninsured properties by its agents. The Missouri statutes cited by the plaintiffs do not create any duty for First American to supervise any of Capital Title's loan transactions or recording/filing of deeds of trust activities on property for which no title insurance was issued.

Missouri Statute §381.018 (2007)[6] required only that the title insurers audit their agents every three (3) years. Missouri Statute §381.022 (2007) required, among other things, that title insurers share the results of the audits with the Director of the Missouri Department of Insurance. There is no statutory duty, express or otherwise implied, for title insurers to take any action based upon the results of the audits.

Missouri title insurance law specifically provides for the Director of the Missouri Department of Insurance, and not private citizens/entities, to enforce Missouri's insurance laws and to bring a cause of action against title insurers for violations of Missouri's title insurance laws. §381.048 R.S.Mo. Finally, Missouri Statute §375.930 specifically provides that no private cause of action exists for alleged violations of Missouri's insurance laws.

Thus, as plaintiffs concede, defendant First American conducted audits as required under Missouri law, and presumably, reported such findings to the Director of the Missouri Department of Insurance, as required under Missouri law. Furthermore, pursuant to Missouri law, the Director of the Missouri Department of Insurance, and not the plaintiffs, is the only one that can pursue enforcement against title insurers, such as First American, for alleged violations of Missouri's title insurance laws. Therefore, Missouri law did not create any duty for First American to supervise and monitor Capital Title's escrow and/or closing activities on properties for which no title insurance commitment and/or policy was issued. Furthermore, the only "duty" created by Missouri insurance laws was once the audits were conducted, to report the findings to the Director of the Missouri Department of Insurance, not to the public at large.

---

[6]The statutes cited by the plaintiffs were amended in 2007, with effective dates of January 1, 2008. The former (applicable) statutory language is cited in this memorandum.

17

Finally, there is only one real property identified in the plaintiffs' complaint upon which a title insurance policy was issued: 4005 Delmar and Bluehaven is the named insured. Plaintiffs have not asserted a claim under this policy for any losses associated with this property.[7] The policy itself does not create any duty upon First American regarding audits of Capital Title's escrow accounts for the benefit of the plaintiffs. Any claim that plaintiffs may have regarding the 4005 Delmar property arising from its title insurance policy is contractual in nature.[8]

Based upon the foregoing reasons, the Court finds that no genuine issue of material fact exists that Capital Title, as First American's agent for the issuance of title insurance commitments and/or policies, did not have actual express, actual implied, or apparent authority to engage in the activities resulting in the plaintiffs' losses as alleged in the plaintiffs' complaint; thus, First American is not vicariously liable to the plaintiffs. Furthermore, First American neither owed nor breached any duty to the plaintiffs regarding any of the activities alleged in the complaint, including but not limited to, the auditing and monitoring of Capital Title's business. Defendant First American is entitled to summary judgment as a matter of law on Counts I-XXII of the plaintiffs' complaint.

Dated this ___20th___ day of May, 2009.

_____
UNITED STATES DISTRICT JUDGE

---

[7]Plaintiffs do not contend that they made any requests directly to First American for the issuance of title insurance policies on any properties which were not provided by First American. Furthermore, there is no evidence before the Court that Capital Title via Hartmann sought the issuance of title insurance policies on other properties (with one or both of the plaintiffs named as the insured) from First American, and such policies were never issued.

[8]Defendant further contends that all title insurance policies, as well as Missouri law provides First American with the option to clear title to an insured property, and that it has either already done so or is in the process of pursuing quiet title actions on certain properties to clear insured titles. Whether or not this is a "good faith" effort by First American to fully discharge its contractual obligations under certain title insurance policies issued (to Bluehaven and non-party Bruce Hartrich) is not an issue presently before the Court.